UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------------

INFINITY CAPITAL LLC, *et al.*,      :
                                     :      Case Nos. 1:18-cv-2422
                  Plaintiffs,        :               1:18-cv-2423
                                     :
vs.                                  :      OPINION & ORDER
                                     :
FRANCIS DAVID CORPORATION,           :
                                     :
                  Defendant.         :
------------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

This case involves a contract dispute between a credit card processor and its sales
agent. Both parties make a number of claims, including contract breach claims.

Defendant Francis David Corporation, d/b/a Electronic Merchant Services ("EMS") is
a credit card processor and Plaintiffs Infinity Capital LLC and John Paul Golino, d/b/a as
Choice ("Choice") acted as EMS's agent.

As background, in 2010, Defendant hired Plaintiff to act as an exclusive sales agent
for the Defendant's credit card processing services. The Plaintiff, who came to the agency
relationship with past success selling credit card processing services, became one of
Defendant's most successful sales agents.

In this industry, processing companies pay their sales agents a percentage of the
merchant processed transactions. Under widespread practice, processing companies pay
these commissions, also known as residuals, for as long as the merchant continues credit
processing with the processing company.

Defendant mostly used non-exclusive sales agents. In 2015, Plaintiff sought, and

Defendant agreed, to change their agency contract to allow Plaintiff to sell for other credit card processing providers. After this 2016 agency contract amendment, Plaintiff continued selling Defendant processing services but also sold other companies' processing services and itself provided some processing services.

In 2018, Defendant terminated its agency relationship with Plaintiff. This case considers whether the parties' agreement required Defendant to continue paying the residual sales commission for merchants that Plaintiff brought to Defendant. Plaintiff argues it does; Defendant argues the opposite.

The case also considers whether the 2016 amendment to the parties' agreement allowed Plaintiff to sell its own credit processing services to the customers it brought to Defendant, when the additional services did not reduce Defendant's customers' processing levels. In other words, did the contract allow Plaintiff to sell additional processing capacity to customers that Defendant declined to extend additional capacity to?

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** judgment for Plaintiffs on Count III (breach of contract). It **DENIES** judgment for Plaintiffs on Counts I (declaratory judgment), II (injunctive relief), IV (breach of good faith and fair dealing), V (accounting and restitution), VI (tortious interference), VII (tortious interference), VIII (tortious interference), and IX (deceptive trade practices). Further, the Court **GRANTS** judgment for Defendant on Count V (unjust enrichment). It **GRANTS IN PART** and **DENIES IN PART** judgment for Defendant on Count III (breach of contract). And it **DENIES** judgment for Defendant on Counts I (declaratory judgment), II (injunctive relief), and IV (accounting and restitution). Further, the Court **GRANTS** Plaintiffs' motion for attorney's

fees and costs.

## I.    Background

In an increasingly cashless market, merchants depend on credit card processors for payment processing.  Those credit card processors typically charge merchants for card processing based on transaction type and volume.  In general, established retail merchants pay lower processing fees than internet merchants or merchants who receive more refund demands.

Because of the nearly limitless number of merchants using credit card processing facilities, processors more often use independent sales agents to obtain merchant processing customers.  To compensate the sales agents, processors typically agree to pay the agents a percentage of the merchant's processing volume for as long as the merchant customers use the processor's services—a "residual."[1]  Agents view residuals as a significant asset; a nearly perpetual revenue stream that can be sold or borrowed against.[2] Recognizing Plaintiff Choice's right to receive these residual payments, the parties agreement here provided "EMS is responsible for paying [Choice] the Residual Income attributable to Merchant Processing Services it provides to Merchants that are referred to EMS by [Choice]."

In this case, Choice principally claims EMS wrongly stopped paying the owed residual stream from merchants Choice secured.  For its part, EMS claims that once Choice brought the customer to EMS, Choice could not offer those customers any service, even services that EMS refused to provide.  EMS says Choice wrongfully solicited its merchant

---

[1] Doc. 52 at 65.
[2] *Id.* at 78–79.

customers.

## A.    The Parties' Relationship & The Amended Agreement

In 2010, Defendant EMS contracted with Plaintiff Choice to market EMS's services. Under the 2010 Agreement, a Choice sale of EMS services gave Choice a commission right that continued so long as the solicited customer continued EMS services: a residual.[3]  The 2010 contract required Choice to exclusively market EMS credit card processing services.

In 2015, Choice sought to change its business relation with EMS.[4]  While still serving as EMS's agent, Choice proposed to also offer its own merchant credit card processing.[5]  Further, Choice sought to offer "secondary sourcing" to EMS's merchants. Choice (and EMS) received higher servicing fees from internet merchants but, because these merchants were somewhat riskier, EMS limited the monthly volume t it would process for such merchants.  Secondary sourcing would allow Choice to provide its own credit card processing for volume beyond the EMS limits.

Because credit processing facilities are so crucial for merchants, and because credit processors usually enforce processing limits, merchants often used multiple processors.[6] Multiple processors avoid problems with processor-volume caps and avoid exposure to reliance upon a single processor.[7]

Choice asked to amend the 2010 agreement.  Choice wanted to itself process credit card payments and sought amendments to allow Choice to place customer business with other processors even while continuing customer placement with EMS.  EMS already used

---

[3] Pl. Ex. 8.
[4] *Id.* at 73.
[5] *E.g.,* Doc. 55 at 364.
[6] Doc. 52 at 91.
[7] *Id.*

a large number of non-exclusive sales agents and Choice's proposal for a non-exclusive relationship was not unusual.

In February 2016 EMS and Choice entered a new agreement (the "Amended Agreement").[8]  With the Amended Agreement, Choice would no longer be an exclusive EMS agent and Choice would also provide its own processing.  Under the Amended Agreement, EMS continued compensating Choice through residual payments as long as the customer continued using EMS services.

Central to this case, the Amended Agreement changed a non-solicitation provision that had been included in the 2010 Agreement.  Under the 2010 Agreement, Choice agreed not to

    (i)      to solicit or attempt to solicit, directly or indirectly, any EMS Merchant for any purpose other than training, support, or other purposes approved in writing by EMS;

    (ii)     to solicit or attempt to solicit, directly or indirectly, any EMS Merchant to terminate its relationship with EMS.

The 2016 Agreement changed this and included a provision requiring that Choice not *knowingly*:

    (i)      Solicit any EMS Merchants for any purpose other than training and support for EMS Merchant Processing Services [or]

    (ii)     Solicit or Attempt to Solicit any EMS Merchants to reduce or discontinue their Merchant Processing Services relationship with EMS.[9]

The Amended Agreement broadly defined "Solicit" as "to make contact with a Merchant or otherwise assist or enable a Merchant in the prohibited activity (even if the Merchant

---

[8] Pl. Ex. 3.

[9] *Id.* at 5 (Amended Agreement, § 4.1).

-5-

initiated the contact)."[10]

The Amended Agreement made these changes. First, it required that any disqualifying conduct be knowing conduct. Second, the Amended Agreement stated that only solicitations that reduced or discontinued processing services became prohibited.

Under the Amended Agreement EMS was generally required to continue making residual payments so long as the merchant customers that Choice brought to EMS continued using EMS services. However, the Amended Agreement included a penalty provision—the loss of the residual—if Choice violated the non-solicitation provision.[11]

## B.     Termination & This Case

As described, the Amended Agreement required EMS pay residual commissions for Choice-secured processing customers who continued using EMS services. Reflecting Choice's rights to the residual payment stream, the Amended Agreement gave Choice the right to sell this residual stream of commission payments. It also required EMS to protect Choice's residual rights if EMS sold its merchants.

In June 2018, third-party Chesapeake Bank negotiated to purchase 65% of Choice's residual portfolio for approximately $3 million.[12]

As part of its negotiations with Choice, Chesapeake Bank sought to change the Amended Agreement to better protect Chesapeake's continued right to the residual stream.[13] EMS rejected those changes and the Choice-Chesapeake Bank sale of Choice's residual rights collapsed on August 21, 2018.[14]

---

[10] *Id.* at 16 (Amended Agreement, Schedule B).
[11] *Id.* at 6 (Amended Agreement, § 5.3).
[12] Doc. 52 at 167–68; Pl. Ex. 31.
[13] Doc. 52 at 170–71. *See* Pl. Ex. 42.
[14] Doc. 52 at 174; Pl. Ex. 44.

The very next day, EMS accused Choice of breaching the Amended Agreement's non-solicitation provision by providing services to an EMS merchant.[15]  Choice responded that it had only provided secondary sourcing to EMS merchants.  Choice argued to EMS that the Amended Agreement allowed secondary sourcing for EMS customers so long as it did not reduce EMS's processing volume.[16]  On September 14, 2018, EMS terminated the Amended Agreement and stopped making the residual payments.[17]

Both parties separately sued.[18]  Noting the obvious overlap, the Court consolidated the cases.[19]

Choice, arguing that the Amended Agreement allowed secondary sourcing, brings claims for declaratory judgment, injunctive relief, breach of contract, breach of the implied duty of good faith and fair dealing, restitution, tortious interference, and deceptive trade practices.[20]  EMS, arguing the opposite, brings claims for declaratory judgment, injunctive relief, breach of contract, restitution, and unjust enrichment.[21]  After a February 2019, bench trial,[22] both sides submitted proposed findings of fact and conclusions of law.[23]

## II.    Discussion

Because this case is here under the Court's diversity jurisdiction,[24] and because the parties' contract says Ohio law governs the contract's interpretation, the Court applies

[15] Pl. Ex. 45.
[16] Pl. Ex. 123.
[17] Pl. Ex. 46.
[18] Doc. 1; Complaint, Doc. 1-1, *Francis David Corp. v. Golino*, 1:18-cv-2423 (N.D. Ohio Sept. 14, 2018).
[19] Doc. 13.
[20] Doc. 1.
[21] *Id.*; Complaint, Doc. 1-1, *Francis David Corp.*, 1:18-cv-2423 (N.D. Ohio Sept. 14, 2018).
[22] Docs. 52, 55.
[23] Docs. 57, 58.
[24] *Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 715 (6th Cir. 2015) (choice of law provisions generally enforceable under Ohio law).  *See Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001) (federal court sitting in diversity applies law of the forum state).

Ohio law.[25]

The Court takes the parties' claims in turn, determining whether the party with the respective burden proved their claim by a preponderance of the evidence.

### A. The Court Partially Grants and Partially Denies EMS's Breach of Contract Claim

EMS claims that Choice breached the Amended Agreement by "soliciting" its merchants. Under Ohio law, to win this claim, EMS must show: (i) the existence of a contract, (ii) EMS's qualifying performance, (iii) Choice's breach, and (iv) damages caused by Choice's breach.[26] The parties dispute only whether Choice's solicitations broke the Amended Agreement and harmed EMS.

#### 1. The Amended Agreement Only Prohibited Business-Reducing Solicitations

When interpreting a contract, a court's primary responsibility is to give effect to the parties' intent.[27] Here, the Amended Agreement's unclear and likely inconsistent provisions hinders that contract construction effort.

Again, the Amended Agreement's relevant provisions say that Choice cannot:

(i)     "Solicit any EMS Merchants for any purpose other than training and support for EMS Merchant Processing Services [or]

(ii)    Solicit or Attempt to Solicit any EMS Merchants to reduce or discontinue their Merchant Processing Services relationship with EMS."[28]

And the Amended Agreement defines "Solicit" as "to make contact with a Merchant or otherwise assist or enable a Merchant in the prohibited activity (even if the Merchant

---

[25] Pl. Ex. 3 at 6 (Amended Agreement, § 7.1).

[26] *E.g., V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (applying Ohio law).

[27] *E.g., Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E. 2d 519, 525 (Ohio 1997).

[28] Pl. Ex. 3 at 5 (Amended Agreement, § 4.1).

initiated the contact)."[29]  Subsection (i) appeared in both the 2010 Agreement and the 2016

Amended Agreement.  Whereas Subsection (ii) was changed in the later 2016 Amended

Agreement.  As amended, Subsection (ii) was agreed to years after Subsection (i).

Confusion stems from the overlap in the two clauses.[30]  Subsection (i) arguably

prohibits any merchant contact other than training or support.  In contrast, Subsection (ii)

only forbids customer solicitations seeking to reduce customer purchases from EMS or

seeking to terminate the customer's EMS processing.  EMS favors the former interpretation,

Choice the latter.

Under Ohio law, a court should attempt to construe a contract to avoid

surplusage.[31]  Yet, if EMS's argument is accepted, Subsection (i) renders Subsection (ii)

completely unnecessary.  Subsection (i) would forbid any Choice sales to existing

customers while Subsection (ii) allows such sales unless they reduce EMS sales.  Given this

textual ambiguity, the Court turns to other evidence of the parties' intent.[32]

The Amended Agreement's drafting history is mixed.  In seeking a change to the

2010 Agreement, Choice aimed to assist its customers with alternative processing where

EMS caps or policies limited EMS's willingness to cover those customers and end its

exclusive EMS agency.

In the 2016 agreement negotiations, Choice sought explicit language allowing

secondary sourcing;[33] EMS did not agree to this inclusion.[34]  The bargaining history does

---

[29] *Id.* at 16 (Amended Agreement, Schedule B).  Unhelpfully, the Amended Agreement fails to identify what the "prohibited activity" is.

[30] Redundancy lurks even within Subsection (ii).  After all, what is "discontinuing" but "reducing" completely?

[31] *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 363 (6th Cir. 2014) (applying Ohio law).

[32] *MRI Software, L.L.C. v. W. Oaks Mall FL., L.L.C.*, 116 N.E.3d 694, 701 (Ohio Ct. App. 2018).

[33] Pl. Ex. 1.

[34] Def. Ex. 21 at 3–4; Doc. 52 at 234.

not reveal why Choice's proposal was not included.  But the Amended Agreement's

integration clause makes the drafting history less relevant.[35]

The parties' course of dealing after the 2016 Amended Agreement execution speaks

more clearly about the parties' intent.[36]  In March 2016, Choice asked EMS to confirm that

it could offer secondary sourcing.[37]  After two weeks passed, EMS responded, stating that:

> [EMS] think it's clear . . . [Y]ou agreed that you will not (and you will require
> that your Representatives will not) Solicit or attempt to Solicit any EMS
> Merchants to reduce or discontinue their Merchant Processing Services
> relationship with EMS . . . . If you or one of your reps spoke with an EMS
> merchant about, or assisted/enabled that merchant to reduce its EMS
> processing volume, or to stop processing with EMS we would have an
> issue.[38]

When Choice sought further clarification, EMS responded that Choice could not

"poach the customer" or "otherwise dilute the value of [the] customer relationship,"[39] again

focusing only on Subsection (ii).  EMS did not respond when asked for a third clarification.

In April 2016, on two separate occasions, Choice told EMS that it was considering

providing secondary sourcing to three specific EMS merchants.  EMS never responded.

EMS never told Choice that secondary sourcing would violate the Amended Agreement.

Later that year, Choice told EMS that it wanted to provide secondary sourcing for a specific

EMS merchant.[40]  EMS responded that, while the merchant still had room under the

volume-cap, "[i]f he insists on diversifying go ahead."[41]

---

[35] *See Bellman v. Am. Int'l Grp.*, 865 N.E.2d 853, 856–57 (Ohio 2007) ("[A] writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing.").

[36] *See* Restatement (Second) of Contracts § 202 (Am. Law Inst. 1981) ("Wherever reasonable, the manifestations of intention . . . are interpreted as consistent with . . . any relevant course of performance [or] course of dealing.").

[37] Pl. Ex. 6.

[38] *Id.*

[39] *Id.*

[40] Pl. Ex. 52.

[41] *Id.*

Surrounding contract language also indicates that the parties intended to forbid only business-reducing solicitation.[42] At the time of the 2016 Amended Agreement negotiations, EMS knew that Choice used third-party sales agents. Often, these third-party sales agents solicited for Choice but also solicited sales for other credit processors.

The Amended Agreement required Choice to prohibit its sales agents from soliciting EMS merchants "to reduce or discontinue their Merchant Processing Services relationship with EMS."[43] This language tracks Subsection (ii) exactly and omits Subsection (i) entirely. If the parties had intended to stop all Choice contact with EMS customers, it makes little sense that EMS would only prohibit Choice's agents from business-reducing-contact. Especially considering that Choice conducted most of its business through agents.

Contractual ambiguity is construed strictly against the drafter.[44] Not only is the entire Amended Agreement on "copyrighted" EMS letterhead,[45] EMS drafted the non-solicitation provision.

Equity too demands extending EMS no favors. Choice's repeated attempts at clarification were met with responses ranging from the non-existent, to the unhelpful, to the outright misleading. Contracting parties should work together, not play "gotcha."

As described earlier, Subsection (i) was drafted with the 2010 Agreement and at a time when Choice acted as an exclusive agent. Subsection (ii) came with the 2016 contract negotiations and presumptively better reflects the parties' intent after the parties agreed that Choice would no longer be an exclusive agent.

---

[42] *See* Restatement (Second) of Contracts § 202 (Am. Law Inst. 1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").
[43] Pl. Ex. 3 (Amended Agreement, § 4.4 & Schedule B).
[44] *Smith v. Eliza Jennings Home*, 199 N.E.2d 733, 735–36 (Ohio 1964).
[45] Whatever that means.

The Court concludes that Subsection (ii)—not Subsection (i)—reflects the true intention of the parties.

Separately, while the Court need not resolve it here, Subsection (i) l likely imposes an unreasonable trade restriction. In considering employee trade restrictions, Ohio courts consider, *inter alia*: (i) whether the employee was the sole customer contract, (ii) whether the employee possesses confidential information or trade secrets, (iii) whether the covenant seeks to stifle the employee's inherent skill and experience, and (iv) whether the employee's skills were developed during the employment.[46]

Here, EMS did not provide Choice or its principle John Paul Golino with significant confidential information or trade secrets,[47] nor did EMS train Choice or Golino, who had already spent a year in the industry with another company.[48] Nor, did EMS train Choice's sub-agents, through whom Choice did most of its marketing. Choice was not the sole merchant point-of-contact,[49] nor did EMS apparently have much to do with Choice's marketing.[50]

These efforts to evade the gauntlet of competition is divorced from any legitimate business interest and anathema to the entire American experiment.[51] It was, after all, the protest of competition restrictions that sparked history's most famous tea party.[52]

---

[46] *See Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975)
[47] *See* Doc. 52 at 259–62.
[48] *Id.* at 42.
[49] *E.g.,* Doc. 55 at 72.
[50] Pl. Ex. 8 (original agreement, §§ 2.3, 2.5, 2.6).
[51] "America was born as a nation of farmers and small-town entrepreneurs . . . anti-authoritarian, egalitarian, and competitive." David Leonhardt, *The Monopolization of America*, N.Y. Times (Nov 25, 2018), https://www.nytimes.com/2018/11/25/opinion/monopolies-in-the-us.html (quoting historian Richard Hofstadter).
[52] *Id.*

### 2. Choice Solicited EMS Merchants to Reduce Their Business with EMS

Having determined the contract's meaning, the question now is whether Choice breached the non-solicitation provision, and whether that breach harmed EMS. Because Choice only breached if it reduced EMS's business, the questions go hand-in-hand.

The parties agree that Choice processed payments for roughly seventy EMS merchants.[53] Most had EMS processing limits or EMS refused to process in certain commercial areas. They disagree whether Choice conducted secondary processing—reducing nothing—or primary processing—harming EMS's business.

EMS claims damages for nearly all identified merchants to the tune of $981,500.[54] There are two problems with this claim.

First, for most of the merchants, EMS failed to show that Choice's volume reduced EMS's own volume. For example, eight claimed merchants used additional processors beyond Choice and EMS.[55] EMS failed to show that, even with Choice out of the picture, those merchants would have increased their business with EMS rather than placing the processing with other processors.[56] Other processors provided processing to these customers. Further, EMS largely failed to show that Choice was offering services to merchants who had not hit their EMS volume cap.

Second, EMS used a faulty damage formula. It multiplied Choice's merchant-volume (right) by EMS's profit margin for that merchant (probably wrong),[57] and then

---

[53] Def. Ex. 75; Pl. Ex. 60.
[54] Def. Ex. 75; Doc. 58 at 40.
[55] Pl. Ex. 60.
[56] *See* Doc. 55 at 210–11.
[57] EMS's CFO testified that Choice undercuts EMS's profit margin, meaning there is no guarantee that the merchant would have used EMS at its higher rate. Thus, Choice's profit margin is a better metric.

applied an 18x-multiplier (inexplicably wrong).[58]  Instead, the Court calculates EMS's

damages by multiplying Choice's merchant-volume, for the merchants *under EMS's*

*volume-cap*, by *Choice's* profit margin.[59]

The Court concludes that Choice breached the Amended Agreement by reducing

EMS business by $57,859.54 and grants partial judgment for EMS's Count III.

### B.      The Court Partially Grants and Partially Denies Choice's Breach of Contract Claim

Contract damages seek to compensate actual harm, not punish breaches or deter

them through the looming guillotine of draconian damages.[60]  Thus, contractual penalty

clauses are unenforceable.

Choice argues Amended Agreement Section 5.3, the residual termination clause, is

an unenforceable penalty.  The Court agrees; EMS had no right to terminate the residual

and breached the Amended Agreement by doing so.

### 1.  The Residual Termination Clause Is an Unenforceable Penalty

Through years of labor, Choice developed a residual compensation right worth over

$5 million.  Yet, EMS claims the Amended Agreement allowed EMS to erase that $5

million asset for any non-solicitation breach—without the possibility to cure—no matter

how minor.  This is obviously a penalty.[61]

---

[58] The multiplier seems designed to capture the total lifetime value of a merchant, but EMS is still processing the merchants.

[59] *See* Addendum.

[60] *E.g.*, *In re Graham Square, Inc.*, 126 F.3d 823, 828 (6th Cir. 1997) (applying Ohio law) ("[T]he sole purpose of contract damages is to compensate the nonbreaching party for losses suffered . . . . Punishment of a promisor for having broken his promise has no justification."); *Embleton v. McMechen*, 143 N.E. 177, 179 (Ohio 1924) ("In reason, in conscience, in natural equity, there is no ground to say, because a man has stipulated for a penalty in case of his omission to do a particular act . . . that if he omits to do the act he shall suffer an enormous loss wholly disproportionate to the injury to the other party.").

[61] *In re Graham Square, Inc.*, 126 F.3d at 828 (applying Ohio law) ("[T]he characteristic feature of a penalty is a lack of proportional relation to the damages which may actually flow from failure to perform under the contract.").

First, the residual termination clause clearly has purpose and effect of punishment: an aggressive consequence for breach entirely divorced from actual harm designed to scare a party into compliance.

Also, EMS itself all but admitted that it intended for the residual termination to be punitive. While negotiating the Amended Agreement, EMS said that "[w]e understand your fear of losing your residuals, but frankly this is our only real *leverage* over an agent."[62]

Even more telling, in August 2018, Choice proposed that it be allowed to cure non-solicitation violations by offering a replacement merchant of equal or greater value. EMS rejected the proposal, saying:

> [u]nfortunately, a substitute merchant . . . doesn't come close to making sense for EMS. We're talking about EMS giving up a right that would potentially cost the agent his entire revenue stream, millions of dollars . . . . *This is both a powerful incentive against the behavior we don't want, and a benefit to EMS which is significantly more than the value of one merchant.*[63]

Later, EMS again rejected the Choice proposal to allow Choice to remedy any non-solicitation error with an equal value customer, claiming it wanted a *"hammer"* in the agreement.[64]

EMS counters that the residual termination was not a penalty, but rather the failure of a condition subsequent.[65] Put differently, EMS argues that EMS's residual obligation was conditioned on Choice's non-solicitation-clause compliance.

---

[62] Def. Ex. 22 at 2 (emphasis added).

[63] Pl. Ex. 43 at 1 (emphasis added). *See In re Graham Square, Inc.,* 126 F.3d at 828 ("[T]he characteristic feature of a penalty is a lack of proportional relation to the damages which may actually flow from failure to perform under the contract. A penalty, therefore, is designed to coerce performance by punishing nonperformance; its principal object is not compensation for the losses suffered by the nonbreaching party.").

[64] Doc. 52 at 173. EMS's apparent arbitrary punishments for non-solicitation violations further underscores the punitive scheme. *See* Doc. 55 at 212–16 (discussing EMS's handling of a different agent's breach).

[65] Doc. 58 at 43.

However, the failure of conditions subsequent do not usually constitute breach.[66]  Yet here, it is the entire basis for EMS's suit.

Also, the residual termination clause still has purpose and effect of a penalty. Changing the label from "penalty" to "condition subsequent," makes it no more valid.[67]

Finally, the residual's characteristics strain EMS's argument.  As EMS once told Choice, "we own the customer and you *own* the residual stream."[68]  And sales agent residual ownership runs throughout the credit card processing industry.  The industry-standard seems to be a continuing residual for the life of the merchant-relationship.[69]  Moreover, the Amended Agreement allowed Choice to sell the residual.[70]  And, if EMS sold its merchant agreements, Choice could compel EMS to purchase the residual.[71]  Thus, the termination more closely resembled pilfering Choice's property than ending a continuing obligation.

EMS also argues that the provision might still survive as a liquidated damages clause.[72]  But "the essence of liquidated damages is a genuine covenanted pre-estimate of damages."[73]  Here, there is no evidence that the residual termination estimated potential damages.  To the contrary, EMS admitted in an e-mail that the

---

[66] *See Carl Ralston Ins. Agency, Inc. v. Nationwide Mut. Ins. Co.*, No. 23336, 2007 WL 397313, *3 (Ohio Ct. App. Feb. 7, 2007).

[67] *See Raffel v. Medallion Kitchens of Minn., Inc.*, 139 F.3d 1142, 1144–45 (7th Cir. 1998).  Not to mention, even if Section 5.3 were a condition subsequent, allowing EMS to retain the Choice-recruited merchants without the residual would almost certainly be unjust enrichment.

[68] Pl. Ex. 6 (emphasis added).

[69] Doc. 52 at 65–66, 67.  For example, its continued nature allowed agents to borrow against it.  *Id.* at 79.

[70] Pl. Ex. 3 (Amended Agreement, §§ 3.3, 4.5).

[71] *Id.* (Amended Agreement, §§ 3.2).

[72] Doc. 58 at 43–44.

[73] *Boone Coleman Constr., Inc. v. Piketon*, 50 N.E.3d 502, 509 (Ohio 2016) (plurality op.).

residual termination was intended to be disproportionate to actual damages.[74]

That the penalty was all or nothing, without reference to breach severity, further undercuts EMS's argument. As does the fact that EMS's right "to discontinue payment of Residual Income [is] *in addition to* and without prejudice to any other rights EMS may have at law or equity."[75] Accordingly, Amended Agreement Section 5.3 is unenforceable, and EMS breached by terminating the residual.

### 2. Choice's Damages

How to value the residual? The parties' inability to play well together makes reinstating monthly payments a recipe for disaster.[76]

The residual payments are based on Choice-recruited merchants' processing volume, which fluctuates. This fluidity makes valuation tricky, but not impossible.

At termination, EMS paid Choice monthly residual payments of $133,000.[77] With a historic 2% monthly merchant-attrition rate,[78] the residual payment stream would pay about $6,061,223 over its life.[79]

However, the residual was never intended to payout all at once. And because of inflation, interest rates, and investment opportunities, $6 million today is worth more than $6 million years from now. For that reason, the Court concludes that the residual has a

---

[74] *See* Pl. Ex. 43 at 1 ("We're talking about EMS giving up a right that would potentially cost the agent his entire revenue stream, millions of dollars . . . . This is both a powerful incentive against the behavior we don't want, and a benefit to EMS which is significantly more than the value of one merchant.").
[75] Pl. Ex. 3 (Amended Agreement, § 5.3) (emphasis added).
[76] Also, injunctive relief is only available where legal relief is impossible.
[77] Doc. 52 at 183.
[78] *Id.* at 224.
[79] The Court first calculated the monthly residual payout for the first 120 months (Month 1 x .98 = Month 2, Month 2 x .98 = Month 3, etc.) and then added the monthly values together.

present-day value of $5,527,791.29.[80]

Thus, the Court finds EMS's breach caused Choice $5,527,791.29 in damages.

## C.     The Court Grants EMS's Unjust Enrichment Claim

EMS had earlier overpaid Choice's residual over the course of nineteen

months.[81]  Choice repaid some of this amount, but Choice still owes EMS $170,120.64

from that overpayment.[82]  Accordingly, EMS brings a claim for unjust enrichment.  Choice

concedes liability for this debt.[83]  The Court grants EMS's Count V claim for the

$170,120.64.

## D.     The Court Denies Choice's Tortious Interference Claims

Choice originally claimed that EMS tortiously interfered with its relationships with

Choice's: (i) agents, (ii) lender, and (iii) prospective-residual-buyer, Chesapeake Bank.[84]

The Court may easily dispose of the first two tortious-interference claims—Choice failed to

present evidence relevant to these claims at trial and appears to have abandoned them.

Turning to the third, in June 2018, Chesapeake Bank negotiated to purchase the

rights to most of Choice's residual payments.  Under the Amended Agreement, EMS had a

right-of-first-refusal to match Chesapeake Bank's offer for these residual payments.  EMS e-

mailed Choice declining its right-of-first-refusal.  In doing so, EMS expressed concern that

---

[80] The Court presumed that present value = future value / 1 + (number of years paid out x interest rate).  *E.g.,* Accounting Tools, https://www.accountingtools.com/articles/what-is-the-formula-for-the-present-value-of-a-future-amount.html (last visited June 3, 2019).  As discussed *supra,* the Court concludes that the residual's future value is $6,061,223.15.  The Court presumed a ten-year payout (theoretically the payout could continue indefinitely, but after ten years it would have been mostly exhausted, only paying around $10,000 per month) and a 1.93% interest rate (based on the Treasury Department's five-year rate.  The Treasury Department, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/textview.aspx?data=yield (last visited June 3, 2019).  This is also roughly in line with Chesapeake's valuation.

[81] Doc. 52 at 154–65; Pl. Ex. 29.

[82] Doc. 57 at 48; Doc. 58 at 46.

[83] Doc. 57 at 48.

[84] Doc. 1 (Counts VI, VII, and VIII).

too many Choice-recruited merchants were leaving EMS.  Choice forwarded that e-mail to Chesapeake, who demanded a change to the Amended Agreement Choice could not provide, causing the Chesapeake Bank deal to collapse.

To succeed, Choice must at least show that EMS wrongfully interfered with Choice's business relations.[85]  However, it was *Choice's* inexplicable decision to forward EMS's e-mail that caused the harm.  Thus, the Court denies Choice Counts VI, VII, and VIII.

## E.    The Court Denies Choice & EMS's Remaining Claims

Choice sought: (i) a declaration that the Amended Agreement permitted secondary sourcing, (ii) relief for EMS's alleged breach of good faith and fair dealing, and (iii) an accounting and restitution for the terminated residual.[86]  However, these claims are duplicative of Choice's breach of contract claim.  Thus, the Court denies Choice's Counts I, IV, and V.

Choice originally sought an injunction requiring EMS to make residual payments,[87] but has since dropped this claim.[88]  Accordingly, the Court denies Choice's Count II.

Finally, Choice brought a claim for deceptive trade practices under Ohio law.[89] However, by failing to produce evidence relevant to this claims a trial or even mention it in its proposed findings of fact and conclusions, Choice has abandoned this claim.  Thus, the Court denies Choice's Count IX.

EMS also brought claims for declaratory judgment, restitution, and injunctive

---

[85] *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (elements include the existence of a business relationship, defendant's knowledge of that contract, defendant's intentional interference, lack of justification, and damages).
[86] Doc. 1 (Counts I, IV, and V).
[87] *Id.* (Count II).
[88] Doc. 57 at 48.
[89] Doc. 1 (Count IX).

relief—all of which are duplicative of EMS's breach of contract claim.  Accordingly, the

Court denies EMS's Counts I, II, and IV.

### III.    Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART**

judgment for Plaintiffs on Count III.  It **DENIES** judgment for Plaintiffs on Counts I, II, IV, V,

VI, VII, VIII, and IX.  Further, the Court **GRANTS** judgment for Defendant on Count V.  It

**GRANTS IN PART** and **DENIES IN PART** judgment for Defendant on Count III.  And it

**DENIES** judgment for Defendant on Counts I, II, and IV.  Thus, the Court **ORDERS**

Defendant to pay Plaintiffs $5,423,541.01.[90]  The Court also **GRANTS** Plaintiffs' motion for

attorney's fees and costs under the Amended Agreement[91] and **ORDERS** Plaintiffs to

produce relevant evidence.

IT IS SO ORDERED.


Dated: June 3, 2019                          _s/     James S. Gwin_____
                                             JAMES S. GWIN
                                             UNITED STATES DISTRICT JUDGE

---

[90] Defendant owes Plaintiff $5,665,986.07 (breach of contract damages with 2.5% prejudgment interest), offset by the $242,445.07 Plaintiffs owe Defendant (breach of contract damages with 2.5% prejudgment interest plus unjust enrichment damages).  Ohio law mandates a 5% annual pre-judgment interest rate. Ohio Rev. Code § 1343.03.

[91] Doc. 57 (Plaintiffs requesting attorney's fees and costs); Pl. Ex. 3 (Amended Agreement, § 7.1) ("Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs.").

## ADDENDUM

| EMS Merchant[1] | Choice Total Volume[2] | EMS Volume Cap[3] | Approx. Choice Volume Below EMS Cap[4] | Choice Total Net Profit[5] | Months Processing[6] | Choice Profit Margin[7] | EMS's Damages[8] |
|---|---|---|---|---|---|---|---|
| ALUMNI PREP SERVICES | 633323.39 | 40,000/ 150,000[9] | 386546.86 | 14843.29 | 8 | 0.02 | $9059.55 |
| MY PAYMENT HELP CENTER LLC | 287926.8 | 100,000 | 249479.55 | 9139.04 | 16 | 0.03 | $7918.70 |
| STUDENT LOAN SUPPORT SERVICES | 328439.85 | 40,000 | 328439.85 | 4731.36 | 22 | 0.01 | $4731.36 |
| CREDIT 360 | 512112.01 | 50,000 | 512030.35 | 4547.95 | 18 | 0.01 | $4547.22 |
| NEW START ADVISORS | 111042.1 | 50,000 | 111042.7 | 3022.67 | 8 | 0.03 | $3022.67 |
| AM PM CREDIT REPAIR | 112383 | 60,000 | 112382 | 2321.29 | 3 | 0.02 | $2321.27 |
| D AND F CREDIT CONSULTING | 138094.42 | 15,000 | 138094.42 | 1511.18 | 16 | 0.01 | $1511.18 |
| LIBERTY CREDIT EXPERTS | 102334.33 | 15,000 | 102633.33 | 1383.59 | 17 | 0.01 | $1387.64 |
| CREDIT REPAIR CONSULTANTS | 130723.2 | 48,000/ 24,000 | 152026.3 | 1348.37 | 16 | 0.01 | $1568.11 |
| GORDON BONETTI FLORIST | 174483.23 | Unlimited | 174483.23 | 1185.60 | 16 | 0.01 | $1185.60 |
| SAFE CREDIT SOLUTIONS | 72808 | 100,000/ 150,000 | 65544 | 1210.98 | 16 | 0.02 | $1090.16 |
| CREDIT SCORE BUILDER | 36905.79 | 20,000 | 13342.51 | 2420.40 | 18 | 0.07 | $875.04 |
| CREDIT WISE RECOVERY SOLUTION | 22401.7 | 65,000 | 22301.7 | 815.73 | 7 | 0.04 | $812.09 |
| CRYSTAL CLEAR CREDIT | 34157.2 | 25,000 | 25314.41 | 766.24 | 5 | 0.02 | $567.87 |
| CREDIT REINVENTORS | 17861 | 10,000 | 17861 | 520.82 | 22 | 0.03 | $520.82 |
| IDEAL DOCUMENTS | 14441 | 40,000 | 2000 | 417.29 | 1 | 0.03 | $57.79 |
| ALUMNI HELP CENTER | 807598.14 | 60,000/ 70,000/ 120,000 | 267240.77 | 18636.84 | 13 | 0.02 | $6167.08 |
| LINCOLN TREASURY | 690440.52 | 750,000 | 622396.57 | 10359.42 | 12 | 0.02 | $9338.48 |
| CMC | 77718.86 | 25,000 | 77718.86 | 1176.91 | 16 | 0.02 | $1176.91 |
|  |  |  |  |  |  | Total Damages: | $57859.54 |

[1] Pl. Ex. 60; Def. Ex. 75.
[2] Id.
[3] Def. Exs. 41, 42, 44, 45, 118.
[4] See Pl. Ex. 60; Def. Exs. 41, 42, 44, 45, 118.
[5] Pl. Ex. 60.
[6] Id.
[7] The Court calculated this by dividing Choice's Net Profit by Choice's Total Volume.
[8] The Court calculated this by multiplying the Choice Volume Below EMS Cap by Choice Profit Margin.
[9] Some merchants had varying volume caps over time.